# Exhibit 1
# Part A

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| IN RE: | ) |
| | ) |
| | ) |
| MARVEL ENTERTAINMENT GROUP, INC.; THE | ) |
| ASHER CANDY COMPANY; FLEER CORP.; | ) |
| FRANK H. FLEER CORP.; HEROES WORLD | ) |
| DISTRIBUTION, INC.; MALIBU COMICS | ) Case No. 97-638-RRM |
| ENTERTAINMENT, INC.; MARVEL | ) |
| CHARACTERS, INC.; MARVEL DIRECT | ) |
| MARKETING INC.; and SKYBOX | ) |
| INTERNATIONAL, INC., | ) |
| | ) |
| Debtors. | ) |

## FOURTH AMENDED JOINT PLAN OF REORGANIZATION PROPOSED BY THE SECURED LENDERS AND TOY BIZ, INC.

WACHTELL, LIPTON, ROSEN & KATZ
Attorneys for The Secured
  Lenders
51 West 52nd Street
New York, New York  10019
(212) 403-1000

-and-

RICHARDS, LAYTON & FINGER, P.A.
Attorneys for The Secured
  Lenders
One Rodney Square
Wilmington, Delaware  19899
(302) 658-6541

BATTLE FOWLER LLP
Attorneys for Toy Biz, Inc.
75 East 55th Street
New York, New York  10022
(212) 856-7000

-and-

PEPPER HAMILTON LLP
Attorneys for Toy Biz, Inc.
1201 Market Street
P.O. Box 1709
Wilmington, Delaware  19899
(302) 777-6500

Dated:  Wilmington, Delaware
      July 31, 1998

## TABLE OF CONTENTS

Page

SECTION 1.   DEFINITIONS AND INTERPRETATION . . . . . . . . . .   1
             A.   Definitions . . . . . . . . . . . . . . . . .   1
             B.   Interpretation; Application of Definitions
                  and Rules of Construction . . . . . .  24
             C.   Exhibits and Schedules . . . . . . . . .  25

SECTION 2.   PROVISIONS FOR PAYMENT OF ADMINISTRATION EXPENSE
             CLAIMS AND PRIORITY TAX CLAIMS . . . . . . . .  25
             2.1  Administration Expense Claims . . . . . . .  25
             2.2  Compensation and Reimbursement Claims . . .  25
             2.3  Priority Tax Claims . . . . . . . . . . . .  26

SECTION 3.   CLASSIFICATION OF CLAIMS
                          AND EQUITY INTERESTS . . . . . . . .  26

SECTION 4.   PROVISIONS FOR TREATMENT OF CLAIMS
                          AND EQUITY INTERESTS UNDER THE PLAN .  27
             4.1  Priority Non-Tax Claims (Class 1) . . . . .  27
             4.2  Senior Secured Claims . . . . . . . . . . .  27
             (a)  Allowance of Senior Secured Claims . . . .  27
             (b)  Treatment of Allowed Fixed Senior Secured
                  Claims . . . . . . . . . . . . . . . . . .  27
                  (i) No Qualifying . . . . . . . . . . . . .  27
                  (ii)Qualifying . . . . . . . . . . . . . .  29
             (c)  Treatment of Allowed Contingent Senior Secured
                  Claims . . . . . . . . . . . . . . . . . .  29
                  (i)  No Panini . . . . . . . . . . . . . .  29
                  (ii) Panini . . . . . . . . . . . . . . . .  29
             4.3  Other Secured Claims (Class 3) . . . . . .  29
             4.4  Unsecured Claims (Class 4) . . . . . . . .  30
             (a)  Distributions . . . . . . . . . . . . . . .  30
                  (i) No Qualifying . . . . . . . . . . . . .  30
                  (ii) Qualifying . . . . . . . . . . . . . .  31
             (b)  Intercompany Claims . . . . . . . . . . . .  31
             (c)  LaSalle Claim . . . . . . . . . . . . . . .  31
             4.5  Class Securities Litigation Claims
                          (Class 5) . . . . . . . . . . . . .  31
             (a)  Distributions . . . . . . . . . . . . . . .  31
             (b)  Calculation of Distribution . . . . . . . .  32
             (c)  Parity of and Limitation on Distributions .  32
             4.6  Equity Interests (Class 6) . . . . . . . .  32
             (a)  Entertainment (Subclass 6A) . . . . . . . .  32
                  (i)  Distributions . . . . . . . . . . . .  32
                  (ii)  Parity of and Limitation on
                          Distributions . . . . . . . . . . .  33
             (b)  Subsidiary Equity Interest (Subclass 6B) .  33
             4.7  Existing Warrants (Class 7) . . . . . . . .  33

i

Page

SECTION 5.    IDENTIFICATION OF CLASSES OF CLAIMS AND INTERESTS
              IMPAIRED AND NOT IMPAIRED UNDER THE PLAN; ACCEPTANCE
              OR REJECTION OF THE PLAN . . . . . . . . . . .    33
              5.1   Holders of Claims and Equity Interests Entitled
                    to Vote . . . . . . . . . . . . . . . . .    33
              5.2   Nonconsensual Confirmation . . . . . . .     34
              5.3   Severability of Plan of Reorganization . .   34

SECTION 6.    MEANS OF IMPLEMENTATION . . . . . . . . . . .      34
              6.1   Closing of Transaction . . . . . . . . .     34
              6.2   Derivative Securities Litigation Claims . .  34
              6.3   Board of Directors of the Reorganized
                          Debtors . . . . . . . . . . . . . .    35
              6.4   Officers of the Reorganized Debtors . . . .  35
              6.5   Distribution to New Investors . . . . . .    35
              6.6   Toy Biz Distribution . . . . . . . . . .     35
              (a)   No Qualifying Transaction . . . . . . . .    35
              (b)   Qualifying Transaction . . . . . . . . .     35
              6.7   Fees to New Investors . . . . . . . . . .    36
              6.8   Dissolution of Committees . . . . . . . .    36
              6.9   Intentionally deleted . . . . . . . . . .    36
              6.10  Newco Financing . . . . . . . . . . . .      36
              6.11  Vote of Characters' Toy Biz Stock . . . .    36
              6.12  Forgiveness of Panini Obligations . . . .    37
              6.13  Panini Indemnity . . . . . . . . . . . .     37
              6.14  Outstanding Toy Biz Stock Interests . . .    37
              6.15  Distribution of Subsidiary Equity
                          Interests . . . . . . . . . . . . .    37
              6.16  Continuation of Creditors Committee . . .    37
              6.17  Right to Object to Fees . . . . . . . .      37
              6.18  Certain Securities Law Matters . . . . .     38
              6.19  Settlement Amount . . . . . . . . . . .      39
              6.20  Excess Administration Claims Amount Loan .   39
              6.21  Perlmutter Capital Contribution . . . .      39

SECTION 7.    LITIGATION TRUST . . . . . . . . . . . . . .       39
              7.1   Assignment of Rights . . . . . . . . . .     39
              (a)   Avoidance Litigation Trust . . . . . . .     39
              (b)   MAFCO Litigation Trust . . . . . . . . .     40
              7.2   Control of Litigation . . . . . . . . . .    40
              7.3   Liability of Trustee . . . . . . . . . .     40
              7.4   Distribution of Net Avoidance Litigation
                    Proceeds and Net MAFCO Litigation Proceeds   41
              7.5   Professional Fees and Expenses . . . . .     41
              (a)   Avoidance Litigation Trust . . . . . . .     41
              (b)   MAFCO Litigation Trust . . . . . . . . .     42
              7.6   Commencement of Avoidance Actions . . . .    43
              7.7   Reduction of Judgment and Indemnifications   43
              7.8   Timing of Distributions . . . . . . . . .    45

                                                                  Page

          7.9  Objections to Claims  . . . . . . . . . .   45
          7.10 Jurisdiction  . . . . . . . . . . . . . .   46

SECTION 8.   PROVISIONS GOVERNING DISTRIBUTIONS . . . . . .   46
          8.1  Date of Distributions . . . . . . . . . .   46
          8.2  Entities to Exercise Function of Disbursing
               Agent . . . . . . . . . . . . . . . . . .   47
          8.3  Surrender and Cancellation of Instruments .  47
          8.4  (a) Delivery of Distributions . . . . . .   47
               (b) LaSalle Distributions . . . . . . . .   48
          8.5  Manner of Payment Under Plan of
               Reorganization  . . . . . . . . . . . . .   48
          8.6  Reserves and Distributions  . . . . . . .   49
          8.7  Resulting Claims  . . . . . . . . . . . .   49
          8.8  Distributions After Consummation Date . . .  49
          8.9  Rights And Powers Of Disbursing Agent . .   49
          (a)  Powers of the Disbursing Agent  . . . . .   49
          (b)  Expenses Incurred on or after the
               Consummation Date . . . . . . . . . . . .   50
          (c)  Exculpation . . . . . . . . . . . . . . .   50
          8.10 Distributions of Certain Warrants . . . .   50

SECTION 9.   PROCEDURES FOR TREATING DISPUTED CLAIMS UNDER THE
          PLAN OF REORGANIZATION . . . . . . . . . . . .   51
          9.1  Objections to Claims  . . . . . . . . . .   51
          9.2  No Distributions Pending Allowance . . . .  51
          9.3  Cash Reserve  . . . . . . . . . . . . . .   51
          9.4  Distributions After Allowance . . . . . .   51
          9.5  Fractional Securities . . . . . . . . . .   52

SECTION 10.  PROVISION GOVERNING EXECUTORY CONTRACTS AND
          UNEXPIRED LEASES UNDER THE PLAN . . . . . . .   52
          10.1 General Treatment  . . . . . . . . . . .   52
          10.2 Amendments to Schedule; Effect of
               Amendments  . . . . . . . . . . . . . .   53
          10.3 Bar to Rejection Damage Claims . . . . .   53
          10.4 Certain Panini Agreements . . . . . . .   54
          (a)  Panini Sticker Agreement . . . . . . . .   54
          (b)  Panini Comic Distribution Agreement . . .   54
          (c)  Other Panini Agreements . . . . . . . .   54

SECTION 11.  CONDITIONS PRECEDENT TO CONFIRMATION DATE AND
          CONSUMMATION DATE . . . . . . . . . . . . . .   54
          11.1 Conditions Precedent to Confirmation of Plan
               of Reorganization . . . . . . . . . . .   54
          (a)  Confirmation Order  . . . . . . . . . .   54
          11.2 Conditions Precedent to Consummation Date of
               Plan of Reorganization . . . . . . . . .   55
          (a)  SEC Proxy Statement . . . . . . . . . .   55

                                iii

Page

(b)    HSR . . . . . . . . . . . . . . . . . . . .   55
(c)    Restructured Panini Loan Documents . . . .   56
(d)    Secured Lender Consummation Date . . . . .   56
(e)    Toy Biz Consummation Date . . . . . . . .   56
(f)    Standstill Agreements . . . . . . . . . .   56
(g)    NBA Agreement . . . . . . . . . . . . . .   56
(h)    Receipt of Certain Funds . . . . . . . .   56
(i)    Receipt of Settlement Amount . . . . . .   56
(j)    Certain Payments for Contingent Senior
              Secured Claims . . . . . . . . .   56
(k)    Shareholders Agreement . . . . . . . . .   56
11.3   Waiver of Conditions Precedent . . . . . .   57

SECTION 12.    EFFECT OF CONFIRMATION . . . . . . . . . . .   57
12.1   General Authority . . . . . . . . . . .   57
12.2   Discharge of Debtors . . . . . . . . . .   57
(a)    General Discharge . . . . . . . . . . . .   57
(b)    Exculpations . . . . . . . . . . . . . .   58
12.3   Term of Injunctions or Stays . . . . . .   59

SECTION 13.    WAIVER OF CLAIMS . . . . . . . . . . . . . .   59
13.1   Avoidance Actions . . . . . . . . . . .   59

SECTION 14.    RETENTION OF JURISDICTION . . . . . . . . . .   60
14.1   Retention of Jurisdiction . . . . . . .   60
14.2   Amendment of Plan of Reorganization . . .   61

SECTION 15.    MISCELLANEOUS PROVISIONS . . . . . . . . . .   62
15.1   Payment of Statutory Fees . . . . . . .   62
15.2   Retiree Benefits . . . . . . . . . . . .   62
15.3   Compliance with Tax Requirements . . . .   63
15.4   Recognition of Guaranty Rights . . . . .   63
15.5   Severability of Plan Provisions . . . .   63
15.6   Governing Law . . . . . . . . . . . . .   64
15.7   Further Assurances . . . . . . . . . . .   64
15.8   Time of the Essence . . . . . . . . . .   64
15.9   Counterparts . . . . . . . . . . . . . .   64
15.10  Notices . . . . . . . . . . . . . . . .   64

iv

## EXHIBITS

1.   Avoidance Litigation Trust Agreement
2.   Avoidance Litigation Trust Loan Agreement
3.   Avoidance Professional Fee Reimbursement Note
4.   Bylaws for Newco
5.   Charter for Newco
6.   Designated Competitors
7.   Excess Administration Claims Note
8.   MAFCO Litigation Trust Agreement
9.   MAFCO Litigation Trust Loan Agreement
10.  MAFCO Professional Fee Reimbursement Note
11.  Merger Agreement
12.  New Investors
13.  Newco Guaranty
14.  Panini Indemnity
15.  Plan Warrant Agreement
16.  Secured Lenders
17.  Standstill Agreements
18.  Stockholder Series A Warrant Agreement
19.  Stockholder Series B Warrant Agreement
20.  Stockholder Series C Warrant Agreement
21.  Transmittal Material

## SCHEDULES

6.1.   Letter of Credit and related obligations
10.1.  Rejection Schedule

v

JOINT PLAN OF REORGANIZATION

The Secured Lenders and Toy Biz, Inc., creditors and parties in interest in these chapter 11 cases, hereby propose this Plan of Reorganization dated July 31, 1998 for Marvel Entertainment Group, Inc., The Asher Candy Company, Fleer Corp., Frank H. Fleer Corp., Heroes World Distribution, Inc., Malibu Comics Entertainment, Inc., Marvel Characters, Inc., Marvel Direct Marketing Inc. and SkyBox International Inc.

SECTION 1.    .   <u>DEFINITIONS AND INTERPRETATION</u>

A.   <u>Definitions</u>.

The following terms used herein shall have the respective meanings defined below:

"Administration Expense Claim" means any right to payment constituting a cost or expense of administration of any of the Reorganization Cases allowed under Sections 503(b) and 507(a)(1) of the Bankruptcy Code, including, without limitation, (a) any actual and necessary costs and expenses of preserving the estates of the Debtors, (b) any actual and necessary costs and expenses of operating the business of the Debtors, (c) any allowances of compensation and reimbursement of expenses to the extent allowed by Final Order under Section 330 or 503 of the Bankruptcy Code, and (d) any fees or charges assessed against the estates of the Debtors under Section 1930, title 28, United States Code.

"Administrative Agent" means The Chase Manhattan Bank as administrative agent under each of the applicable Existing Credit Agreements or any successor administrative agent appointed in accordance with any of the applicable Existing Credit Agreements.

"Affiliate" means, with reference to any person or entity, any other person or entity that, within the meaning of Rule 12b-2 promulgated under the Securities Exchange Act of 1934, as amended, "controls," is "controlled by" or is under "common control with" such entity or person.

"Allowed" means, with reference to any Claim or Equity Interest, (a) any and all DIP Claims, (b) any Claim or Equity Interest or any portion thereof against any Debtor which has been listed by such Debtor in its Schedules, as such Schedules may be amended by the Debtors from time to time in accordance with Bankruptcy Rule 1009, as liquidated in amount and not disputed or contingent and for which no contrary proof of claim has been filed, (c) any Claim or Equity Interest allowed by Final Order, (d) any Claim or Equity Interest as to which the liability of the

Debtors and the amount thereof are determined by final order of a court of competent jurisdiction other than the Bankruptcy Court, (e) any Claim allowed expressly hereunder, or (f) for purposes of voting only, any Claim evidenced by a proof of Claim filed by or before the last date designated by the Bankruptcy Court as the last date for filing Claims against the Debtors, provided that such Claim has not been disallowed by order of the Court or the Bankruptcy Court, and is not the subject of an objection filed at least ten (10) days prior to the voting deadline.

"Avoidance Beneficiaries" means Newco, all holders of Allowed Fixed Senior Secured Claims and all holders of Allowed Unsecured Claims (other than Intercompany Claims and the LaSalle Claim).

"Avoidance Litigation Trust" means the trust created by the Avoidance Litigation Trust Agreement to be executed on the Consummation Date pursuant to Section 7.1 hereof by the Debtors and the Avoidance Litigation Trustee.

"Avoidance Litigation Trust Agreement" means the trust agreement to be executed by the Debtors and the Avoidance Litigation Trustee in the form of Exhibit 1 hereto, subject to non-substantive changes.

"Avoidance Litigation Trust Assets" means all assets of the Avoidance Litigation Trust.

"Avoidance Litigation Trustee" means the individual designated by the Creditors Committee subject to the consent of the Proponents, and from and after the Consummation Date, any successor trustees designated in accordance with the Avoidance Litigation Trust Agreement.

"Avoidance Litigation Trust Loan Agreement" means the Loan Agreement to be executed by Newco in the form of Exhibit 2 hereto, subject to non-substantive changes.

"Avoidance Professional Fee Reimbursement Note" means the note to be executed by the Avoidance Litigation Trustee on behalf of the Avoidance Litigation Trust in the form of Exhibit 3 hereto, subject to non-substantive changes.

"Bankruptcy Code" means title 11, United States Code, as applicable to the Reorganization Cases as in effect on the Confirmation Date.

"Bankruptcy Court" means the United States District Court for the District of Delaware having jurisdiction over the Reorganization Cases and, to the extent of any reference under

2

section 157, title 28, United States Code, the unit of such
District Court under section 151, title 28, United States Code.

"Bankruptcy Rules" means the Federal Rules of
Bankruptcy Procedure as promulgated by the United States Supreme
Court under section 2075, title 28, United States Code, and any
Local Rules of the Bankruptcy Court.

"Beneficiaries" means all Avoidance Beneficiaries and
all MAFCO Beneficiaries.

"Breakup Fee" means Cash in the amount of the breakup
fee payable pursuant to the Convertible Preferred Stock Purchase
Agreement to DPI or its assignees, but in no event more than
eight million dollars ($8,000,000).

"Business Day" means any day other than a Saturday, a
Sunday or any other day on which banking institutions in New
York, New York are required or authorized to close by law or
executive order.

"Bylaws" means the bylaws for Newco in the form of
Exhibit 4 hereto, subject to non-substantive changes.

"Cash" means legal tender of the United States of
America and, with respect to payments under this Plan of
Reorganization, cash (U.S. dollars), certified check, bank check
or wire transfer from a domestic bank.

"Causes of Action" means, without limitation, any and
all actions, causes of action, liabilities, obligations, rights,
suits, debts, sums of money, damages, judgments, claims and
demands whatsoever, whether known or unknown, in law, equity or
otherwise.

"Characters" means Marvel Characters, Inc., one of the
Debtors herein.

"Charter" means the Certificate of Incorporation for
Newco in the form of Exhibit 5 hereto, subject to non-substantive
changes.

"Chase" means The Chase Manhattan Bank in its capacity
as agent under the Existing Credit Agreements.

"Claim" means (a) any right to payment from any of the
Debtors, whether or not such right is reduced to judgment,
liquidated, unliquidated, fixed, contingent, matured, unmatured,
disputed, undisputed, legal, equitable, secured, or unsecured, or
(b) any right to an equitable remedy for breach of performance if
such breach gives rise to a right of payment from any of the
Debtors, whether or not such right to an equitable remedy is

3

reduced to judgment, fixed, contingent, matured, unmatured, disputed, undisputed, secured, or unsecured.

"Class Securities Litigation Claim" means any Claim whether or not the subject of an existing lawsuit arising from rescission of a purchase or sale of shares of common stock of Entertainment, for damages arising from the purchase or sale of any such security, or for reimbursement or contribution allowed under section 502 of the Bankruptcy Code on account of any such Claim (which shall exclude the LaSalle Claim) which Claims shall be subordinated in accordance with section 510(b) of the Bankruptcy Code.

"Collateral" means any property or interest in property of the estate of any Debtor subject to a Lien to secure the payment or performance of a Claim, which Lien is not subject to avoidance under the Bankruptcy Code.

"Confection Business" means any and all of the assets and properties relating to the confection business operated and owned by Fleer including, without limitation, all of its rights relating to Dubble Bubble, Razzles and any other food and candy products produced thereby.

"Confirmation Date" means the date on which the Clerk of the Bankruptcy Court enters the Confirmation Order on its docket.

"Confirmation Hearing" means the hearing held by the Bankruptcy Court on confirmation of this Plan of Reorganization, as such hearing may be adjourned or continued from time to time.

"Confirmation Order" means the order of the Bankruptcy Court confirming this Plan of Reorganization.

"Consummation Date" means the latest to occur of (a) the thirtieth (30th) day (calculated under Bankruptcy Rule 9006) after the Confirmation Date if no stay of the Confirmation Order is then in effect, (b) the first Business Day after any stay of the Confirmation Order expires or otherwise terminates, and (c) such other date as may be fixed from time to time after the Confirmation Date by filing a notice thereof by the Proponents with the Bankruptcy Court upon the consent of the Creditors Committee, the Equity Committee, High River, Westgate, LaSalle and the Trustee not to be unreasonably withheld or delayed; provided, however, that in no event shall the Consummation Date occur earlier than the date of the satisfaction of each of the conditions precedent to the occurrence of the Consummation Date of this Plan of Reorganization in Section 11.2 hereof unless waived as provided in Section 11.3 hereof.

4

"Contingent Senior Secured Claim" means any Claim against Entertainment or any of its Debtor subsidiaries governed by or arising out of the guaranty provisions contained in the Existing Panini Credit Agreements or evidenced by any of the promissory notes issued thereunder or any letter of credit issued by a bank or other financial institution which is a party to the Existing Panini Credit Agreements for the account of Panini or any of its subsidiaries and any Claim for adequate protection relating to the Collateral securing the Claims previously referred to in this definition arising out of that certain Revolving Credit Guaranty Agreement by and among Entertainment, the other Debtors and Chase dated December 27, 1996, the order entered by the Bankruptcy Court on January 24, 1997, or any amendments entered into or further orders entered by the Bankruptcy Court with respect to either of the foregoing.

"Contribution Bar Party" means any person or entity asserting claims in the nature of contribution or indemnity in connection with, arising out of or in any way related to Litigation Claims or Covered Claims.

"Convertible Preferred Stock" means convertible preferred stock in Newco (a) each share of which shall be convertible into 1.039 shares of Newco Common Stock, and (b) which shall have the terms set forth in the Charter.

"Convertible Preferred Stock Purchase Agreement" means a Convertible Preferred Stock Purchase Agreement to be executed on the Confirmation Date by Toy Biz, Zib Inc. or its assignees and DPI or its assignees.

"Covered Claims" means any claim or matter as to which Exculpated Persons are exculpated pursuant to section 12.2(b) of this Plan of Reorganization, including, without limitation, matters asserted or claims made in the LaSalle Action.

"Covered Person" means any person or entity asserting a Covered Claim.

"Creditors Committee" means the Official Committee of Unsecured Creditors appointed for the Debtors by the United States Trustee for the District of Delaware on October 22, 1997.

"Debtor" means each of Entertainment, The Asher Candy Company, Fleer Corp., Frank H. Fleer Corp., Heroes World Distribution, Inc., Malibu Comics Entertainment, Inc., Marvel Characters, Inc., Marvel Direct Marketing, Inc., and SkyBox International Inc., each (other than Marvel Characters, Inc. and Malibu Comics Entertainment, Inc.) being a Delaware corporation and Marvel Characters, Inc. and Malibu Comics Entertainment, Inc. being California corporations, the debtors in Chapter 11 Case Nos. 96-2069 (HSB) through 96-2077 (HSB), respectively.

5

"Debtor in Possession" means each Debtor in its capacity as a debtor in possession under sections 1107(a) and 1108 of the Bankruptcy Code.

"Designated Competitor" means those entities listed on Exhibit 6 hereto.

"Designated Contingent Senior Secured Claims" means on any date all Contingent Senior Secured Claims other than those beneficially owned or controlled (directly, indirectly or by participation) by any entity purchasing Convertible Preferred Stock pursuant to the Convertible Preferred Stock Purchase Agreement other than solely by virtue of the exercise of such entity's rights pursuant to Section 4.2(b)(i)(A)(6) hereof.

"Designated Fixed Senior Secured Claims" means on any date all Fixed Senior Secured Claims other than those beneficially owned or controlled (directly, indirectly or by participation) by any entity purchasing Convertible Preferred Stock pursuant to the Convertible Preferred Stock Purchase Agreement other than solely by virtue of the exercise of such entity's rights pursuant to Section 4.2(b)(i)(A)(6) hereof.

"DIP Claim" shall mean any claim arising under the DIP Credit Agreement.

"DIP Credit Agreement" means that certain Revolving Credit and Guaranty Agreement dated as of December 27, 1996 among Marvel Entertainment Group, Inc., the guarantors named therein, the banks party thereto and The Chase Manhattan Bank as agent as the same may be amended from time to time in accordance with the terms thereof or the agreements or other documents evidencing any successor or replacement post-petition financing facility.

"Disbursing Agent" means any entity in its capacity as a disbursing agent under Section 8.2 hereof.

"Disputed Claim" means a Claim against a Debtor that is not an Allowed Claim.

"District Court Complaint" means the complaint in Case No. 97-586(RRM) filed on October 30, 1997 in the United States District Court for the District of Delaware.

"DPI" means Dickstein Partners Inc.

"Effective Time" shall have the meaning given to such term in the Merger Agreement.

"Entertainment" means Marvel Entertainment Group, Inc.

6

"Equity Committee" means the Official Committee of Equity Security Holders appointed for Entertainment by the United States Trustee for the District of Delaware on February 12, 1997.

"Equity Interest" means any share of common stock or other instrument evidencing a present ownership interest in any of the Debtors, whether or not transferable, or any option, warrant or right, contractual or otherwise, to acquire any such interest. For purposes of Subclass 6A (Entertainment) of Class 6 (Equity Interests), the Existing Warrants shall not be included in such subclass.

"Excess Administration Claims Amount" means the amount, if any, by which the sum of (a) all Allowed Administration Expense Claims (exclusive of (i) all DIP Claims through October 7, 1997 and (ii) Allowed Administration Expenses Claims constituting the actual and necessary expenses of running the Debtors' business in the ordinary course), and (b) the aggregate amount of all professional fees, costs and expenses of professionals engaged by Chase in its capacity as agent or acting on behalf of all of the holders of Senior Secured Claims including, without limitation, all fees and expenses of counsel and financial advisors incurred in connection with the Reorganization Cases, exceeds thirty-five million dollars ($35,000,000).

"Excess Administration Claims Note" means one or more unsecured notes of Newco and its subsidiaries in the form of Exhibit 7 hereto, subject to non-substantive changes, in an aggregate original principal amount equal to the Excess Administration Claims Amount, which shall, at the election of Newco, be paid semi-annually or accrue and compound, shall have a maturity date of the fifth anniversary of the Consummation Date, and which shall bear interest at the rate of two hundred (200) basis points over the rate of interest for the Term Loan Facility.

"Excess Proceeds" means all net proceeds of a Qualifying Transaction which closes on the Consummation Date in excess of the aggregate amount required to satisfy Fixed Senior Secured Claims in full in accordance with the Existing Fleer Credit Agreements, to pay the Toy Biz Cash Distribution and all amounts (other than Excess Proceeds) due to holders of Allowed Unsecured Claims pursuant to Section 4.4(a)(ii) hereof.

"Exculpated Persons" means (a) the Reorganized Debtors, Newco, all past, present and future holders of DIP Claims, all past, present and future holders of Senior Secured Claims, Chase, Toy Biz, the New Investors, Dickstein Partners L.P., Dickstein & Co. L.P., Dickstein Focus Fund, L.P., Dickstein International Limited, Mark Dickstein, the Creditors Committee, all members of the Creditors Committee solely in their capacity as members of

7

the Creditors Committee, High River, Carl Icahn, Westgate, Vince Intrieri, LaSalle, the Equity Committee, all members of the Equity Committee solely in their capacity as members of the Equity Committee, Affiliates of any of the foregoing, the Trustee and all officers, directors, employees, shareholders, limited liability entity members, partners, consultants, advisors, investment bankers, attorneys, accountants or other representatives or agents of any of the foregoing acting as such, and (b) the Debtors; provided, however, that the term "Exculpated Persons" shall not, under any circumstances, include the MAFCO Defendants.

"Existing Credit Agreements" means, collectively, the Existing Fleer Credit Agreements and the Existing Panini Credit Agreements.

"Existing Fleer Credit Agreements" means, collectively, (a) that certain Amended and Restated Credit and Guarantee Agreement dated as of August 30, 1994, as amended, among Entertainment, Fleer Corp., the financial institutions parties thereto, the co-agents named therein and The Chase Manhattan Bank (formerly named Chemical Bank) as administrative agent, (b) that certain Credit and Guarantee Agreement dated as of April 24, 1995, as amended, by and among Entertainment, Fleer Corp., the financial institutions party thereto, the co-agents named therein and The Chase Manhattan Bank (formerly named Chemical Bank) as administrative agent, (c) that certain Line of Credit, dated as of March 27, 1996, as amended, among Fleer Corp., the banks and other financial institutions parties thereto and The Chase Manhattan Bank as Administrative Agent, (d)(i)(A) any letter of credit issued for the account of Entertainment or any of its subsidiaries by a bank or other financial institution which is a party to any of the Existing Credit Agreements referred to in clauses (a) or (b) of this definition of "Existing Fleer Credit Agreements" and (B) any related letter of credit applications and any agreements governing or evidencing reimbursement obligations relating to any letters of credit referred to in clause (d)(i)(A) of this definition of "Existing Fleer Credit Agreements" or (ii) any interest rate agreement between Entertainment or any of its subsidiaries and a bank or other financial institution which is a party to any of the Existing Credit Agreements referred to in clauses (a) through (c), inclusive, of this definition of "Existing Fleer Credit Agreements", and (e) any guarantees and security documents, including, without limitation, mortgages, pledge agreements, security agreements and trademark security agreements, executed and delivered in connection with any of the foregoing agreements.

"Existing Panini Credit Agreements" means the Existing Panini Junior Credit Agreements and the Existing Panini Senior Credit Agreements.

"Existing Panini Junior Credit Agreements" means (a) that certain Term Loan and Guarantee Agreement dated as of August 30, 1994, as amended, supplemented or otherwise modified from time to time, among Entertainment, Panini, S.p.A. (formerly named *Marvel Comics Italia S.r.l.*), and Istituto Bancario San Paolo di Torino, S.p.A.; (b) the Panini Participation Agreements; (c)(i)(A) any letter of credit issued for the account of any of the Panini Entities by a bank or other financial institution pursuant to any of the Panini Credit Agreements referred to in clauses (a) or (b) and (B) any related letter of credit applications and any agreements governing or evidencing reimbursement obligations relating to any letters of credit referred to in clause (c)(i)(A) or (ii) any interest rate agreement between any of the Panini Entities and a bank or other financial institution pursuant to any of the Panini Credit Agreements referred to in clauses (a) and (b); and (d) any guarantees and security documents, including, without limitation, mortgages, pledge agreements, security agreements and trademark security agreements, executed and delivered in connection with any of the foregoing agreements, together in each case with all related documents, instruments, consents, amendments, modifications and waivers.

"Existing Panini Senior Credit Agreements" means that certain Italian Lire 27,000,000,000 Term Loan and Guaranty Agreement dated as of August 5, 1997 as amended, supplemented or otherwise modified from time to time, among Entertainment, Panini, the lenders listed on Schedule 1 thereto as lenders, and The Chase Manhattan Bank as agent, and the related Panini financing order entered by the Bankruptcy Court and any guarantees and security documents, including, without limitation, mortgages, pledge agreements, security agreements and trademark security agreements, executed and delivered in connection with any of the foregoing agreements, together in each case with all related documents, instruments, consents, amendments, modifications and waivers.

"Existing Warrants" means, collectively, all incentive stock options, non-qualified stock options and stock appreciation rights granted under any employee benefits plan and any other options, warrants or rights, contractual or otherwise, if any, to acquire an Equity Interest.

"Final Order" means an order or judgment of the Bankruptcy Court entered by the Clerk of the Bankruptcy Court on the docket in the Reorganization Cases, which has not been reversed, vacated or stayed and as to which (a) the time to appeal, petition for <u>certiorari</u> or move for a new trial, reargument or rehearing has expired and as to which no appeal, petition for <u>certiorari</u> or other proceedings for a new trial, reargument or rehearing shall then be pending or (b) if an appeal, writ of <u>certiorari</u>, new trial, reargument or rehearing

9

thereof has been sought, such order or judgment of the Bankruptcy Court shall have been affirmed by the highest court to which such order was appealed, or certiorari shall have been denied or a new trial, reargument or rehearing shall have been denied or resulted in no modification of such order, and the time to take any further appeal, petition for certiorari or move for a new trial, reargument or rehearing shall have expired; provided, that the possibility that a motion under Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Bankruptcy Rules, may be filed relating to such order, shall not cause such order not to be a Final Order.

"Fixed Senior Secured Claim" means any Claim governed by any of the Existing Fleer Credit Agreements or evidenced by any of the promissory notes issued thereunder or any letter of credit issued by a bank or other financial institution which is a party to any of the Existing Fleer Credit Agreements for the account of Entertainment or any of its subsidiaries (other than the Panini Entities) or any interest rate agreement between Entertainment or any of its subsidiaries (other than the Panini Entities) and a bank or other financial institution which is a party to any of the Existing Fleer Credit Agreements and any Claim for adequate protection relating to the Collateral securing the Claims previously referred to in this definition arising out of that certain Revolving Credit Guaranty Agreement by and among Entertainment, the other Debtors and Chase dated December 27, 1996, the order entered by the Bankruptcy Court on January 24, 1997, or any amendments entered into or further orders entered by the Bankruptcy Court with respect to either of the foregoing.

"Fleer" means Fleer Corp., one of the Debtors.

"Fractional Warrant" means a Warrant to acquire a fractional share of Convertible Preferred Stock or a fractional share of Newco Common Stock.

"Governance Litigation" means case No. 97-648 (RRM) pending in the Bankruptcy Court.

"High River" means High River Limited Partnership.

"Holdings I" means Marvel Holdings, Inc.

"Holdings II" means Marvel (Parent) Holdings, Inc.

"Holdings III" means Marvel III Holdings, Inc.

"Holdings I Indenture" means an indenture dated as of April 15, 1993 between Holdings I, as issuer, and NationsBank of Georgia, N.A. (LaSalle National Bank succeeded Bank of New York, the successor to NationsBank of Georgia, N.A. as indenture trustee).

10

"Holdings II Indenture" means an indenture dated as of October 1, 1993 between Holdings II, as issuer, and NationsBank of Georgia, N.A. (LaSalle National Bank succeeded Bank of New York, the successor to NationsBank of Georgia, N.A. as indenture trustee).

"Holdings III Indenture" means an indenture dated as of February 15, 1994 between Holdings III, as issuer, and NationsBank of Georgia, N.A. (LaSalle National Bank succeeded Bank of New York, the successor to NationsBank of Georgia, N.A. as indenture trustee).

"Holdings Notes" means those certain:  (a) Senior Secured Discount Notes due 1998 issued by Marvel Holdings, Inc. pursuant to the Holdings I Indenture, which were subsequently exchanged for those certain Series B Senior Secured Discount Notes due 1998; (b) Senior Secured Discount Notes due 1998 issued by Marvel (Parent) Holdings Inc. pursuant to the Holdings II Indenture; and (c) 9-1/8% Senior Secured Notes due 1998 issued by Marvel III Holdings Inc. pursuant to the Holdings III Indenture, which were subsequently exchanged for those certain Series B 9-1/8% Senior Secured Notes due 1998.

"Holdings Noteholders" means the registered holders or beneficial owners of any Holdings Notes.

"Immaterial Debtors" means The Asher Candy Company, Frank H. Fleer Corp., Heroes World Distribution, Inc. and any other Debtor which the Proponents, acting reasonably, jointly determine to have de minimis value.

"Independent Cause of Action" means any cause of action which (i) arises solely out of an act or omission of an Exculpated Person occurring after the Consummation Date or (ii) does not arise directly or indirectly in any manner whatsoever out of an act or omission of an Exculpated Person concerning or relating to (v) the Debtors or their subsidiaries or Affiliates, (w) the Reorganization Cases, (x) the creation of the Debtors or any of their subsidiaries or Affiliates, (y) the relationship between Toy Biz (or its predecessors in interest) and any of the Debtors or their subsidiaries and Affiliates, or (z) the LaSalle Action; provided, however, that any claim, counterclaim or right of offset that any defendant in the LaSalle Action may have against any plaintiff or against any person on whose behalf plaintiff is suing in such action shall be deemed to be an Independent Cause of Action.

"Indentures" means, collectively, (a) the Holdings I Indenture, (b) the Holdings II Indenture, and (c) the Holdings III Indenture.

"Intercompany Claim" means any Claim held by any Debtor against any other Debtor, including, without limitation, all derivative Claims asserted by or on behalf of any one Debtor against any other Debtor.

"LaSalle" means LaSalle National Bank solely in its capacity as successor indenture trustee pursuant to the Indentures.

"LaSalle Action" means Civ. No. 97-645 pending in the District Court, or any similar actions asserting similar claims brought by LaSalle on behalf of the Holdings Noteholders against the MAFCO Defendants.

"LaSalle Claim" means any and all Claims of LaSalle and holders of the Holdings Notes against the Debtors whether asserted or not it being understood that LaSalle has filed the LaSalle Withdrawal, which states that such claims comprise only a claim for tortious interference with contractual relations of LaSalle against Entertainment. For the avoidance of any doubt "LaSalle Claim" shall not include the claims or causes of action asserted or that could be asserted by LaSalle on behalf of the Holdings Noteholders in the LaSalle Action against the MAFCO Defendants.

"LaSalle Settlement Amount" means three hundred thousand (300,000) Stockholder Series A Warrants, two hundred twenty five thousand (225,000) Stockholder Series B Warrants and five hundred twenty-five thousand (525,000) Stockholder Series C Warrants.

"LaSalle Withdrawal" means LaSalle National Bank as Indenture Trustee's Withdrawal of Certain Proofs of Claim, filed with the District Court on July 31, 1998.

"Lien" means any charge against or interest in property or an interest in property to secure payment of a debt or performance of an obligation.

"Litigation Claim" means all Causes of Action (including any avoidance action pursuant to sections 510, 544, 545, 547, 548, 549, 550, 551 and 553 of the Bankruptcy Code) of the Debtors other than (i) those relating to any tax sharing or other similar agreement, or (ii) against any person or entity released or exculpated pursuant to this Plan.

"Litigation Trust Agreements" means the Avoidance Litigation Trust Agreement and the MAFCO Litigation Trust Agreement.

"Litigation Trust Assets" means all assets of the Litigation Trusts.

"Litigation Trustees" means the Avoidance Litigation Trustee and the MAFCO Litigation Trustees.

"Litigation Trust Loan Agreements" means the Avoidance Litigation Trust Loan Agreement and the MAFCO Litigation Trust Loan Agreement.

"Litigation Trusts" means the Avoidance Litigation Trust and the MAFCO Litigation Trust.

"MAFCO Beneficiaries" means all holders of Allowed Unsecured Claims (other than Intercompany Claims), holders of Allowed Class Securities Litigation Claims, and holders of Allowed Equity Interests in Entertainment.

"MAFCO Causes of Action" means all Litigation Claims (exclusive of all Causes of Action pursuant to sections 544, 545, 547, 548, 549, 550, 551 and 553 of the Bankruptcy Code) asserted in the District Court Complaint against the MAFCO Defendants or which could have been asserted in the District Court Complaint against the MAFCO Defendants.

"MAFCO Defendants" means (i) Ronald O. Perelman, (ii) MAFCO Holdings, Inc., (iii) MacAndrews & Forbes Holdings, Inc., (iv) the Andrews Group, Inc., (v) Marvel IV Holdings, Inc., (vi) Marvel V Holdings, Inc., (vii) Four Star Holdings, Inc., (viii) William C. Bevins, (ix) Donald G. Drapkin, (x) Holdings I, (xi) Holdings II, (xii) Holdings III, (xiii) any individual who served prior to June 20, 1997 as a director of Entertainment, (xiv) any individual who served on or prior to April 24, 1997 as to Holdings I and Holdings II, or is presently serving or has ever served as to Holdings III, as a director, and (xv) any insider (other than a Releasing Party), Affiliate (other than a Releasing Party or an officer or director of Holdings I or Holdings II serving from and after April 24, 1997), director, employee, attorney (other than a Releasing Party), investment banker (other than a Releasing Party), or agent of any party identified in clauses (i) through (xiv) of this definition acting in such capacity in connection with the MAFCO Causes of Action and the LaSalle Action.

"MAFCO Litigation Trust" means the trust created by the MAFCO Litigation Trust Agreement to be executed on the Consummation Date pursuant to Section 7.1 hereof by the Debtors and the MAFCO Litigation Trustees.

"MAFCO Litigation Trust Agreement" means the trust agreement to be executed by the Debtors and the MAFCO Litigation Trustee in the form of Exhibit 8 hereto, subject to non-substantive changes.

13

"MAFCO Litigation Trust Assets" means all assets of the MAFCO Litigation Trust.

"MAFCO Litigation Trust Loan Agreement" means the Loan Agreement to be executed by Newco in the form of Exhibit 9 hereto, subject to non-substantive changes.

"MAFCO Litigation Trustees" means the three (3) individuals one of which shall be designated by the Equity Committee, one of which shall be designated by the Creditors Committee and one of which shall be designated by the Trustee, and from and after the Consummation Date, any successor trustees designated in accordance with the MAFCO Litigation Trust Agreement.

"MAFCO Professional Fee Reimbursement Note" means the note to be executed by the MAFCO Litigation Trustees on behalf of the MAFCO Litigation Trust in the form of Exhibit 10 hereto, subject to non-substantive changes.

"Marvel" means, collectively, Entertainment and each of its subsidiaries other than the Panini Entities.

"Master Agreement" means that certain Master Agreement by and among the Proponents dated as of October 7, 1997 as the same has been or may be amended from time to time.

"Merger Agreement" means that certain Agreement and Plan of Merger dated as of the Consummation Date in the form annexed as Exhibit 11 hereto, subject to non-substantive changes.

"NBA" means NBA Properties, Inc.

"NBA License Agreement" means that certain Retail Product License Agreement dated July 21, 1995 between Entertainment and the NBA, as amended, supplemented or otherwise modified from time to time.

"NBA Settlement Agreement" means an agreement with the NBA pursuant to which (i) the NBA shall have consented to the Allowance of the unsecured component of its Claim in an amount not to exceed twenty million dollars ($20,000,000) in the aggregate and agreed to waive and release any other Claims it has or may have in classes 4A through 4I, (ii) the NBA withdraws its objection to the Creditors Committee motion pursuant to Fed. R. Civ. P. 60(b) filed on December 23, 1997, and (iii) except as permitted by Paragraph 7 of the Stipulation and Agreement, the distributions to holders of Allowed Unsecured Claims in classes 4A through 4I are not otherwise impacted in a manner which has an impact disproportionate to such classes from the impact, if any, upon the distributions to any other class of Claims or Equity Interests.

14

"Net Avoidance Litigation Proceeds" means the gross proceeds realized by the Avoidance Litigation Trust in respect of all of the Debtors' Causes of Action pursuant to sections 510, 544, 545, 547, 548, 549, 550, 551 and 553 of the Bankruptcy Code net of payment of all expenses of the Avoidance Litigation Trust including, without limitation, (i) payment without duplication of all sums due and owing pursuant to the Avoidance Professional Fee Reimbursement Note, and (ii) any set-off effected by the holders of Resulting Claims pursuant to Section 8.7 hereof.

"Net Cash Proceeds" means the gross proceeds in Cash realized from the sale of capital stock of Newco net of Cash payments, if necessary to cause the occurrence of the Consummation Date, in an amount equal to the aggregate of (i) Administration Expense Claims, including, without limitation, all DIP Claims, (ii) Priority Non-Tax Claims, (iii) Priority Tax Claims, and (iv) any other Cash payments necessary to cause the occurrence of the Consummation Date other than the Toy Biz Cash Distribution and the Required Secured Lender Consideration.

"Net MAFCO Litigation Proceeds" means the gross proceeds realized by the MAFCO Litigation Trust in respect of all of the MAFCO Causes of Action net of payment of all expenses of the MAFCO Litigation Trust including, without limitation, payment without duplication of all sums due and owing pursuant to the MAFCO Professional Fee Reimbursement Note.

"New Investors" means the entities set forth on Exhibit 12 hereto and the holders of Fixed Senior Secured Claims exercising the right to purchase Convertible Preferred Stock in accordance with Section 4.2(b)(i)(A)(6) hereof.

"New Panini Securities" means debt securities of Newco having a present value as of the Consummation Date of twenty seven million dollars ($27,000,000) as determined by a fairness opinion (taking into account, inter alia, the liquidity of the securities) of a nationally recognized investment banking firm reasonably acceptable to Toy Biz and the Panini Lenders, provided, however, that such securities may be equity securities with the consent of the holders two-thirds in amount of the Contingent Senior Secured Claims.

"Newco" means Toy Biz, as its name may be changed, from and after the Consummation Date.

"Newco Common Stock" means the issued and outstanding shares of common stock of Newco as of the Consummation Date.

"Newco Guaranty" means an absolute and unconditional guaranty of Newco and its subsidiaries secured by a valid, binding, enforceable and perfected first priority lien against the Panini Stock to be executed and delivered by Newco in the

15

form annexed hereto as Exhibit 13 subject to non-substantive changes, pursuant to which Newco and its subsidiaries shall guaranty the Restructured Panini Obligations; provided, however, that such guaranty obligation shall be limited to forty million dollars ($40,000,000), thirteen million dollars ($13,000,000) of which shall be payable in Cash on the Consummation Date and the remainder of which shall be payable, at the election of Newco, in the form of either Cash or debt securities of Newco having a then present value of twenty seven million dollars ($27,000,000) as the latter value may be determined by a fairness opinion (taking into account, inter alia, the liquidity of the securities) of a nationally recognized investment banking firm reasonably acceptable to Newco and the Panini Lenders; provided, further, that such securities may be equity securities with the consent of the holders two-thirds in amount of the Contingent Senior Secured Claims.

"Other Secured Claims" means any Secured Claim not constituting a Senior Secured Claim.

"Panini" means Panini S.p.A.

"Panini Comic Distribution Agreement" means that certain agreement to manufacture, reprint, publish and sell Marvel Comics dated December 1995 between Panini and Entertainment.

"Panini Entities" means Panini and its subsidiaries.

"Panini Indemnified Liabilities" means any and all claims, liabilities, obligations, losses, damages, distributions, recoveries, penalties, actions, judgments, suits, costs, expenses (including reasonable fees and expenses of counsel and other professionals) and disbursements of any kind whatsoever which may at any time be imposed on, incurred by or asserted against any Panini Entity in any way relating to, or arising out of, directly or indirectly, any contracts or other agreements to which any of the Debtors are party, including, without limitation, the NBA License Agreement, provided, however, that (i) obligations to repay the Panini Lenders pursuant to the Panini Credit Agreements shall not constitute Panini Indemnified Liabilities and (ii) the Debtors shall not be responsible for making any royalty payments owed to or for the benefit of the National Basketball Association under the NBA License Agreement solely in respect of sticker sales or card sales made by the Panini Entities from and after the Consummation Date; provided that Newco shall control the prosecution, settlement or resolution of such Panini Indemnified Liabilities and provided further that the Panini Entities shall not assert any claims against Newco in respect of Panini Indemnified Liabilities that are asserted outside of any applicable statute of limitations period.

"Panini Indemnity" means an indemnity in the form of Exhibit 14 hereto, subject to non-substantive changes, pursuant to which Newco and its subsidiaries will indemnify and hold harmless the Panini Entities from and against any and all claims, liabilities, obligations, losses, damages, distributions, recoveries, penalties, actions, judgments, suits, costs, expenses (including reasonable fees and expenses of counsel and other professionals) and disbursements of any kind whatsoever which may at any time be imposed on, incurred by or asserted against any Panini Entity in any way relating to, or arising out of directly or indirectly, any contracts or other agreements to which any of the Debtors are party, including, without limitation, the NBA License Agreement, provided, however, that (i) obligations to repay the Panini Lenders pursuant to the Existing Credit Agreements shall not constitute Panini Indemnified Liabilities and (ii) Newco shall not be responsible for making any royalty payments owed to or for the benefit of the National Basketball Association under the NBA License Agreement solely in respect of sticker sales or card sales made by Panini from and after the Consummation Date.

"Panini Lenders" means each of the holders of Panini Obligations arising under the Existing Panini Credit Agreements including any holder of a Panini Obligation through the Panini Participation Agreements.

"Panini Liquidation Event" means the commencement of any insolvency proceeding under the laws of the Republic of Italy or other applicable law which mandates the liquidation of Panini.

"Panini Obligations" means all of the obligations of the Panini Entities arising under the Existing Panini Credit Agreements including, without limitation, outstanding principal, accrued and unpaid interest, fees, costs, expenses, charges and any other amounts owing under the Existing Panini Credit Agreements.

"Panini Participation Agreement" means, collectively, (i) the Participation Agreement dated as of August 30, 1994 among Istituto Bancario San Paolo di Torino, S.p.A., New York Limited Branch, as Italian Lender, The Chase Manhattan Bank, as Administrative Agent, and the financial institutions signatory thereto, as participants and (ii) the Participation Agreement dated as of August 5, 1997 among The Chase Manhattan Bank, as Lender, The Chase Manhattan Bank, as Administrative Agent, and the financial institutions signatory thereto, as participants.

"Panini Sticker Agreement" means that certain License Agreement dated as of November 15, 1996 by and between Characters and Panini.

17

"Panini Stock" means all of the issued and outstanding capital stock of Panini.

"Panini Subordination Agreement" means the subordination agreement dated as of August 5, 1997 by and among (a) each of the Junior Participating Lenders (as defined therein), (b) the Junior Direct Lenders (as defined therein), and (c) Chase as a Senior Lender (as defined therein) and as agent on behalf of itself and the other Senior Lenders (as defined therein).

"Perlmutter Capital Contribution" shall mean an amount of Cash equal to one million five hundred thousand dollars ($1,500,000).

"Petition Date" means December 27, 1996, the date on which each of the Debtors filed its voluntary petition for relief under the Bankruptcy Code.

"Pledged Shares" means the shares of common stock of Entertainment which are owned by Holdings I and Holdings II and pledged to secure the Holdings Notes pursuant to the Indentures and which have not been distributed to holders of the Holdings Notes pursuant to orders of court dated March 3, 1998 (as amended and supplemented by orders dated March 17, 1998 and April 9, 1998) and which are otherwise subject to the lien in favor of LaSalle pursuant to the terms of the Indentures.

"Plan of Reorganization" means this Fourth Amended Joint Plan of Reorganization Proposed By the Secured Lenders and Toy Biz, Inc. dated as of July__, 1998, including, without limitation, the exhibits and schedules hereto, as the same may be amended or modified from time to time in accordance with the terms hereof.

"Plan Warrant Agreement" means that certain Warrant Agreement in the form of Exhibit 15 hereto, subject to non-substantive changes.

"Plan Warrants" means warrants exercisable not later than the fourth (4th) anniversary of the Consummation Date entitling the holder thereof to acquire one share of Newco Common Stock, subject to customary anti-dilution protections, based upon an exercise price of seventeen dollars and twenty-five cents ($17.25) per share and otherwise upon the terms and conditions contained in the Plan Warrant Agreement.

"Priority Non-Tax Claim" means any Claim of a kind specified in section 507(a)(2), (3), (4), (5), (6), (7) or (9) of the Bankruptcy Code.

"Priority Tax Claim" means any Claim of a governmental unit of the kind specified in section 507(a)(8) of the Bankruptcy Code.

"Professional Fee Reimbursement Notes" means the Avoidance Professional Fee Reimbursement Note and the MAFCO Professional Fee Reimbursement Note.

"Proponents" means Toy Biz and the Secured Lenders.

"Qualifying Transaction" means a transaction to be closed not later than ten (10) days after the Confirmation Date to acquire all or a portion of the capital stock of Newco which transaction generates Net Cash Proceeds equal to or greater than the sum of (i) the Toy Biz Cash Distribution, (ii) the Required Secured Lender Consideration, and (iii) the amounts (other than Excess Proceeds) due to holders of Allowed Unsecured Claims pursuant to Section 4.4(a)(ii) hereof, provides for the issuance and distribution by the purchaser of warrants substantially identical to the Stockholder Series A Warrants, Stockholder Series B Warrants, and Stockholder C Warrants otherwise required to be distributed pursuant to this Plan of Reorganization, is otherwise consistent with the terms of this Plan of Reorganization and has been approved as to the Newco Guaranty by Requisite Panini Lender Consent.

"Ratable Proportion" means, with reference to any distribution on account of any Allowed Claim or Allowed Equity interest in any class or subclass, as applicable, a distribution equal in amount to the ratio(as a percentage) that the amount of such Allowed Claim or Allowed Equity interest, as applicable, bears to the aggregate amount of Allowed Claims or Allowed Equity Interests of the same class or subclass, as applicable.

"Releasing Party" has the meaning given to it in the Stipulation and Agreement.

"Reorganization Cases" means the cases commenced under chapter 11 of the Bankruptcy Code by the Debtors.

"Required Secured Lender Consideration" means four hundred and thirty five million dollars ($435,000,000) in Cash payable in respect of the Fixed Senior Secured Claims or such other amount which has been approved by Requisite Secured Lender Consent.

"Requisite Panini Lender Consent" means the written consent of holders of Designated Contingent Senior Secured Claims holding a majority in dollar amount of the aggregate Designated Contingent Senior Secured Claims.

19

"Requisite Secured Lender Consent" means the written consent of holders of Designated Fixed Senior Secured Claims holding at least eighty five percent (85%) in amount of such Designated Fixed Senior Secured Claims.

"Restructured Panini Loan Documents" means loan documents (i) extending the maturity of the Panini Obligations until thirty-six (36) months after the earlier of (a) the Consummation Date or (b) March 31, 1998; (ii) providing that interest in respect of the obligations evidenced by the Existing Panini Senior Credit Agreements shall be paid monthly at the non-default rate thereof; (iii) providing that interest in respect of the obligations evidenced by the Existing Panini Junior Credit Agreements may, at the election of Newco, be paid in Cash or in kind by the issuance of additional notes on a quarterly basis on the last day of March, June, September and December until December 31, 1998, in either case at the non-default rate thereof; (iv) containing customary and reasonable defaults for a transaction of this nature, it being understood and agreed that all defaults which predate the Consummation Date shall be waived and that there shall be no events of default which are inconsistent with the transactions contemplated hereby; (v) requiring Panini to commence paying interest in respect of the obligations evidenced by the Existing Panini Junior Credit Agreements, at the non-default rate thereof, in Cash by making one quarterly Cash interest payment as of January 1, 1999 (on the principal amount thereof including any capitalized amounts) in advance, and thereafter making quarterly Cash interest payments (on the principal amount thereof including any capitalized amounts) in arrears on the last day of March, June, September and December until maturity, it being understood that the first quarterly interest payment in arrears will be due on June 30, 1999 and that no payment will be due on March 31, 1999; (vi) fixing the non-default rate of interest in respect of the Panini Obligations at the same rate as in the Existing Panini Credit Agreements; (vii) fixing the default rate of interest in respect of the Panini Obligations at two hundred (200) basis points above the non-default rate of interest in the Existing Panini Credit Agreements; (viii) containing cure periods consistent with those contained in the Existing Panini Credit Agreements but in no event less than five (5) Business Days; and (ix) which are otherwise in form and substance reasonably acceptable to Toy Biz and the Panini Lenders.

"Restructured Panini Obligations" means all of the obligations under the Restructured Panini Loan Documents.

"Resulting Claim" means any Claim arising pursuant to section 502(h) of the Bankruptcy Code from the recovery of property under section 550 of the Bankruptcy Code.

"Schedules" means the schedules of assets and liabilities and the statements of financial affairs filed by the Debtors under section 521 of the Bankruptcy Code and the Official Bankruptcy Forms of the Bankruptcy Rules as such schedules and statements have been or may be supplemented or amended.

"Secured Claim" means a Claim secured by a Lien on Collateral to the extent of the value of such Collateral, as determined in accordance with section 506(a) of the Bankruptcy Code or, in the event that such Claim is subject to setoff under section 553 of the Bankruptcy Code, to the extent of such setoff.

"Secured Lenders" means those holders of Senior Secured Claims set forth on Exhibit 16 hereof.

"Securities Act" means the Securities Act of 1933, as amended, and the rules and regulations promulgated thereunder.

"Senior Secured Claim" means any Contingent Senior Secured Claim and any Fixed Senior Secured Claim.

"Settlement Amount" means three million five hundred thousand dollars ($3,500,000) in Cash.

"Shareholder Agreement" means a shareholders' agreement by and between Isaac Perlmutter, Isaac Perlmutter, T.A., Zib Inc., Avi Arad, the New Investors and the Secured Lenders in form and substance reasonably acceptable to each of the foregoing and Toy Biz.

"Standstill Agreements" means the Agreements to be executed and delivered by High River, Westgate and certain of their Affiliates on the Consummation Date in the form of Exhibit 17 hereto, subject to non-substantive changes.

"Stipulation and Agreement" means the Stipulation and Agreement Effecting Consensual Amendment to the Third Amended Joint Plan of Reorganization Proposed by the Secured Lenders and Toy Biz, Inc. dated as of July 30, 1998 by and among Toy Biz, Isaac Perlmutter, Isaac Perlmutter T.A., Zib Inc., Avi Arad, Joseph M. Ahearn, James S. Carluccio, Alan Fine, James F. Halpin, Morton E. Handel, Alfred A. Piergallini, Donald E. Rosenblum, Paul R. Verkuil, Mark Dickstein, Dickstein & Co. L.P., Dickstein Focus Fund, L.P., Dickstein International Limited, Dickstein Partners L.P., DPI, the Trustee, Chase individually and on behalf of those holders of Senior Secured Claims which authorize Chase to sign the Stipulation and Agreement on their behalf pursuant to the Master Agreement Amendment, Chase as a holder of a DIP Claim, CIBC, Inc. as a holder of a DIP Claim, Goldman Sachs Credit Partners L.P. as a holder of a DIP Claim, Lehman Commercial Paper Inc. as a holder of a DIP Claim, The Long Term Credit Bank of Japan, Ltd., Los Angeles Agency as a holder of a DIP Claim, The Sumitomo Bank, Limited as a holder of a DIP Claim, High River,

Carl Icahn, Westgate, Vincent Intrieri, LaSalle, the Creditors Committee and the Equity Committee.

"Stockholder Series A Warrants" means warrants exercisable on or before the third (3rd) anniversary of the Consummation Date entitling the holder thereof to acquire one share of Newco Common Stock, subject to customary anti-dilution protections, based upon an initial exercise price of twelve dollars ($12.00) per share and otherwise upon the terms and conditions contained in the Stockholder Series A Warrant Agreement.

"Stockholder Series B Warrants" means warrants entitling the holder thereof to acquire one share of Convertible Preferred Stock at an initial exercise price of ten dollars and sixty-five cents ($10.65) per share, subject to increase as provided in the Stockholder Series B Warrant Agreement and subject to customary anti-dilution protections, which warrants will be issued in one or more series, with all such warrants having the same Warrant Distribution Date constituting the same series and with the warrants in each such series being exercisable until the first (1st) Business Day occurring more than six months after the Warrant Distribution Date of such series, and otherwise having the terms and conditions contained in the Stockholder Series B Warrant Agreement.

"Stockholder Series C Warrants" means warrants exercisable on or before the fourth (4th) anniversary of the Consummation Date entitling the holder thereof to acquire one share of Newco Common Stock, subject to customary anti-dilution protections, based upon an initial exercise price of eighteen dollars and fifty cents ($18.50) per share and otherwise upon the terms and conditions contained in the Stockholder Series C Warrant Agreement.

"Stockholder Series A Warrant Agreement" means that certain Warrant Agreement in the form of Exhibit 18 hereto, subject to non-substantive changes.

"Stockholder Series B Warrant Agreement" means that certain Warrant Agreement in the form of Exhibit 19 hereto, subject to non-substantive changes.

"Stockholder Series C Warrant Agreement" means that certain Warrant Agreement in the form of Exhibit 20 hereto, subject to non-substantive changes.

"Subsidiary Equity Interests" means the Equity Interests in any of the Debtors held by any of the other Debtors.

"Substantial Contribution Application" means any application for compensation or reimbursement of expenses pursuant to sections 503(b)(3) or (4) of the Bankruptcy Code.

"Term Loan Facility" means a term loan facility or other financing arrangement for Newco and its subsidiaries in the amount of at least two hundred million dollars ($200,000,000) less any amount by which the Working Capital Facility exceeds fifty million dollars ($50,000,000) that may be secured by all or substantially all of the assets of Newco upon market rate terms and conditions and otherwise in form and substance reasonably acceptable to the Proponents.

"Toy Biz" means Toy Biz, Inc., a Delaware corporation.

"Toy Biz Cash Distribution" means an amount of Cash equal to the aggregate of (a) two hundred and eighty million dollars ($280,000,000), (b) any commitment or facility fees actually paid in connection with obtaining financing commitments required by this Plan of Reorganization, (c) the fees, expenses and costs of Toy Biz's attorneys, investment bankers, and other professionals incurred in connection with the Reorganization Cases and the transactions contemplated hereby, including, without limitation, in connection with or related to the preparation of any proxy statement, the making of any securities registration and the solicitation of any proxies for Toy Biz in an amount not to exceed in the aggregate (i) three million five hundred thousand dollars ($3,500,000) for the period through and including November 30, 1997, (ii) one million dollars ($1,000,000) for a fairness opinion, (iii) one million, five hundred thousand dollars ($1,500,000) as a success fee, and (iv) an average of six hundred and twenty-five thousand dollars ($625,000) per month thereafter through and including the Consummation Date, and (d) the Breakup Fee.

"Transaction" means the transactions contemplated by the Merger Agreement, and/or, to the extent applicable, the documents governing any Qualifying Transaction.

"Transmittal Material" shall mean the materials in the form of Exhibit 21 hereto, subject to non-substantive changes, which shall be distributed in connection with all Warrants distributed pursuant to this Plan of Reorganization.

"Trustee" means John J. Gibbons solely in his capacity as chapter 11 trustee for the Debtors.

"Unsecured Claim" means any Claim against a Debtor that is not an Administration Expense Claim, a Priority Non-Tax Claim, a Priority Tax Claim, a DIP Claim, a Secured Claim, a Class Securities Litigation Claim, the LaSalle Claim or any deficiency Claim in respect of any Senior Secured Claim.

"Unsecured Creditor Payment" means Cash in an amount equal to fifteen percent (15%) of the aggregate amount of Allowed Unsecured Claims plus two million dollars ($2,000,000), but in no event more than eight million dollars ($8,000,000) in the aggregate.

"U.S. Trustee" means the United States Trustee appointed under section 581, title 28, United States Code to serve in the District of Delaware.

"Warrant Liquidation Agent" means a financial institution to be selected by Toy Biz no later than the Consummation Date subject to the approval of the Trustee not to be unreasonably withheld or delayed and retained by Newco pursuant to the Warrant Liquidation Agency Agreement.

"Warrant Liquidation Agency Agreement" means an agreement in form and substance reasonably satisfactory to the Proponents and the Trustee.

"Warrant Distribution Date" means the first to occur of (i) the date on which Newco substantially completes the distribution of a series of Stockholder Series B Warrants to the record holders of the applicable Claims or Equity Interest in accordance with this Plan of Reorganization, or (ii) the date on which such Stockholder Series B Warrants are distributed to the Warrant Liquidation Agent.

"Warrants" means the Plan Warrants, the Stockholder Series A Warrants, the Stockholder Series B Warrants and the Stockholder Series C Warrants.

"Westgate" means Westgate International L.P.

"Working Capital Facility" means a revolving credit loan facility for Newco and its subsidiaries in an amount of at least fifty million dollars ($50,000,000) less the amount by which the Term Loan Facility exceeds two hundred million ($200,000,000) upon market rate terms and conditions and otherwise in form and substance reasonably acceptable to the Proponents.

B.   Interpretation; Application of
     <u>Definitions and Rules of Construction</u>

*Unless otherwise specified*, all Section, schedule or exhibit references in this Plan of Reorganization are to the respective Section in, article of, or schedule or exhibit to, this Plan of Reorganization, as the same may be amended, waived, or modified from time to time.  The words "herein," "hereof," "hereto," "hereunder," and other words of similar import refer to this Plan of Reorganization as a whole and not to any particular

Section, subsection or clause contained in this Plan of Reorganization. Except as otherwise expressly provided herein, a term used herein that is not defined herein shall have the meaning assigned to that term in the Bankruptcy Code. The rules of construction contained in section 102 of the Bankruptcy Code shall apply to the construction of this Plan of Reorganization. The headings in this Plan of Reorganization are for convenience of reference only and shall not limit or otherwise affect the provisions hereof.

C.    <u>Exhibits and Schedules</u>

All Exhibits and Schedules to this Plan of Reorganization are contained in a supplemental Exhibit filed with the Clerk of the Bankruptcy Court contemporaneously herewith.

SECTION 2.    PROVISIONS FOR PAYMENT OF ADMINISTRATION <u>EXPENSE CLAIMS AND PRIORITY TAX CLAIMS</u>

2.1    <u>Administration Expense Claims</u>.

On the Consummation Date, each holder of an Allowed Administration Expense Claim (including all DIP Claims) shall be paid by Newco on account of such Allowed Administration Expense Claim an amount in Cash equal to the amount of such Allowed Administration Expense Claim, except to the extent that any entity entitled to payment of any Allowed Administration Expense Claim agrees to a different treatment of such Administration Expense Claim; provided, that Allowed Administration Expense Claims representing liabilities incurred in the ordinary course of business by the Debtors in Possession shall be assumed and paid by Newco in accordance with the terms and subject to the conditions of any agreements governing, instruments evidencing or other documents relating to such transactions.

This Plan of Reorganization constitutes a motion by the Proponents to fix a bar date for the filing of Administrative Expense Claims other than the Administration Expense Claims treated under Section 2.2 hereof, which shall be a date fixed by order of the Bankruptcy Court.

2.2    <u>Compensation and Reimbursement Claims</u>.

All entities seeking an award by the Bankruptcy Court of compensation for services rendered or reimbursement of expenses incurred through and including the Consummation Date under section 330 or 503(b)(2) of the Bankruptcy Code (a) shall file their respective final applications for allowances of compensation for services rendered and reimbursement of expenses incurred by the date that is forty-five (45) days after the Consummation Date and, if granted such an award by the Bankruptcy Court, (b) shall be paid in full by Newco in such amounts as are

25

allowed by the Bankruptcy Court (i) upon the later of (A) the
Consummation Date, and (B) the date upon which the order relating
to any such Administration Expense Claim becomes a Final Order or
(ii) upon such other terms as may be mutually agreed upon between
such holder of an Administration Expense Claim and the Proponents
or, on and after the Consummation Date, Newco.

    2.3  <u>Priority Tax Claims</u>.

    On the Consummation Date, each holder of an Allowed
Priority Tax Claim shall be distributed on account of such
Allowed Priority Tax Claim a payment in Cash equal to the amount
of such Allowed Priority Tax Claim.

    SECTION 3.    CLASSIFICATION OF CLAIMS
    <u>AND EQUITY INTERESTS</u>

    Claims against and Equity Interests in the Debtors are
divided into the following classes:

Class 1  —    Priority Non-Tax Claims

Class 2  —    Senior Secured Claims

    Subclass 2A  —    Fixed Senior Secured Claims
    Subclass 2B  —    Contingent Senior Secured Claims

Class 3  —    Other Secured Claims

    Subclass 3A  —    Entertainment
    Subclass 3B  —    The Asher Candy Company
    Subclass 3C  —    Fleer Corp.
    Subclass 3D  —    Frank H. Fleer Corp.
    Subclass 3E  —    Heroes World Distribution, Inc.
    Subclass 3F  —    Malibu Comics Entertainment, Inc.
    Subclass 3G  —    Marvel Characters, Inc.
    Subclass 3H  —    Marvel Direct Marketing Inc.
    Subclass 3I  —    SkyBox International Inc.

Class 4  —    Unsecured Claims

    Subclass 4A  —    Entertainment
    Subclass 4B  —    The Asher Candy Company
    Subclass 4C  —    Fleer Corp.
    Subclass 4D  —    Frank H. Fleer Corp.
    Subclass 4E  —    Heroes World Distribution, Inc.
    Subclass 4F  —    Malibu Comics Entertainment, Inc.
    Subclass 4G  —    Marvel Characters, Inc.
    Subclass 4H  —    Marvel Direct Marketing Inc.
    Subclass 4I  —    SkyBox International Inc.
    Subclass 4J  —    Intercompany Claims
    Subclass 4K  —    LaSalle Claim

26

Class 5    —    Class Securities Litigation Claims

Class 6    —    Equity Interests

    Subclass 6A    —    Entertainment
    Subclass 6B    —    Subsidiary Equity Interests

Class 7    —    Existing Warrants

    SECTION 4.    PROVISIONS FOR TREATMENT OF CLAIMS
                <u>AND EQUITY INTERESTS UNDER THE PLAN</u>

4.1  <u>Priority Non-Tax Claims (Class 1)</u>.

    On the Consummation Date, each holder of an Allowed Priority Non-Tax Claim shall be distributed on account of such Allowed Priority Non-Tax Claim a payment in Cash equal to the amount of its Allowed Priority Non-Tax Claim.

4.2  <u>Senior Secured Claims (Class 2)</u>.

    (a)  <u>Allowance of Senior Secured Claims</u>.  On the Consummation Date, the Claims of each holder of a Senior Secured Claim under each of the Existing Credit Agreements shall be allowed in an amount equal to the amount owing to such holder under the applicable Existing Credit Agreement as of the date hereof, together with interest, fees, charges and other amounts owing under the Existing Credit Agreement through the Consummation Date, but in no event more than an amount equal to the sum of (i) the value of the Collateral as of the Consummation Date securing such Senior Secured Claim, and (ii) any Claim for adequate protection relating to the Collateral, arising out of that certain Revolving Credit Guaranty Agreement by and among Entertainment, the other Debtors and Chase dated December 27, 1996, the order entered by the Bankruptcy Court on January 24, 1997, or any amendments entered into or further orders entered by the Bankruptcy Court with respect to either of the foregoing.

    (b)  <u>Treatment of Allowed Fixed Senior Secured Claims (Subclass 2A)</u>.

    (i) <u>No Qualifying Transaction</u>.

    (A) <u>Distributions</u>.  In the event that no Qualifying Transaction closes, each holder of an Allowed Fixed Senior Secured Claim shall be distributed, subject to increase or decrease pursuant to Section 9.5 hereof, on the Consummation Date, in full and complete satisfaction and discharge of its Fixed Senior Secured Claims, its Ratable Proportion of:

27

(1) two hundred thirty one million, seven hundred and fifty thousand dollars ($231,750,000) in Cash less the sum of (a) the actual amount distributed to the holders of DIP Claims for permanent application against principal from the proceeds of the sale of the Confection Business, and (b) all other amounts paid to satisfy the outstanding principal amount of the DIP Claims (exclusive of any increase in the amount of the DIP Claims from and after October 7, 1997 including, without limitation, any interest or charges which may accrue and all amounts advanced under the DIP Credit Agreements);

(2) thirteen million, one hundred thousand (13,100,000) shares of Newco Common Stock;

(3) seven million nine hundred thousand (7,900,000) shares of Convertible Preferred Stock;

(4) [intentionally deleted];

(5) one thousand (1,000) shares of new common stock of each of the Debtors other than Entertainment representing one hundred percent (100%) of the issued and outstanding stock of such Debtors, which stock shall be transferred to Newco in accordance with section 6.15 hereof;

(6) the right to purchase up to forty million dollars ($40,000,000) of Convertible Preferred Stock of Newco as New Investors that would otherwise be issued to the New Investors set forth on Exhibit 12; and

(7) four and nine tenths percent (4.9%) of the Net Avoidance Litigation Proceeds to be distributed pursuant to Section 7.4(a) hereof.

Subject to the preceding sentence and without duplication, Chase and the holders of Senior Secured Claims shall be reimbursed for all of the professional fees, costs and expenses of professionals engaged by Chase in its capacity as agent or to act on behalf of all holders of Senior Secured Claims, including, without limitation, all fees and expenses of counsel and financial advisors incurred in connection with the Reorganization Cases, provided, however, that in no event shall the aggregate value (as of the Consummation Date) of the property distributed to holders of Fixed Senior Secured Claims exceed the amount of such Fixed Senior Secured Claims or the sum of (i) the value (as of the Consummation Date), of the collateral securing such Fixed Senior Secured Claims, and (ii) any Claim for adequate protection relating to the collateral, arising out of that certain Revolving Credit Guaranty Agreement by and among Entertainment, the other Debtors and Chase dated December 27, 1996, the order entered by the Bankruptcy Court on January 24, 1997, or any amendments

28

entered into or further orders entered by the Bankruptcy Court
with respect to either of the foregoing.

        (B) <u>Intentionally Deleted</u>.

        (ii) <u>Qualifying Transaction</u>.  In the event of a
Qualifying Transaction, each holder of an Allowed Fixed Senior
Secured Claim shall be distributed on the Consummation Date, in
full and complete satisfaction and discharge of its Fixed Senior
Secured Claims, its Ratable Proportion of all consideration
received in connection with such transaction other than (i) the
Toy Biz Cash Distribution, and (ii) any property to be
distributed pursuant to Sections 2, 4.1, 4.2(c), 4.3, 4.4, 4.5
and 4.6 hereof; <u>provided</u>, <u>however</u>, that in no event shall the
holders of Allowed Fixed Senior Secured Claims receive more than
payment in full in accordance with the Existing Fleer Credit
Agreements.

        (c) <u>Treatment of Allowed Contingent Senior
Secured Claims (Subclass 2B)</u>.

        (i) <u>No Panini Liquidation Event</u>. If no Panini
Liquidation Event occurs on or prior to Consummation Date, the
holders of Allowed Contingent Senior Secured Claims shall
receive, on the Consummation Date, in full and complete
satisfaction and discharge of their Contingent Senior Secured
Claims, the Newco Guaranty of the Restructured Panini
Obligations.

        (ii) <u>Panini Liquidation Event</u>. If a Panini
Liquidation Event occurs on or prior to Consummation Date, the
holders of Allowed Contingent Senior Secured Claims shall
receive, on the Consummation Date, in full and complete
satisfaction and discharge of their Contingent Senior Secured
Claims, their Ratable Proportion of the New Panini Securities and
thirteen million dollars ($13,000,000) of Cash.

    4.3 <u>Other Secured Claims (Class 3)</u>.

        On the Consummation Date, each holder of an Allowed
Other Secured Claim in each subclass of Class 3 (Other Secured
Claims) shall in full and complete satisfaction and discharge of
its Other Secured Claim (a) be distributed on account of such
Allowed Other Secured Claim Cash equal to such Allowed Other
Secured Claim, (b) be distributed on account of such Allowed
Other Secured Claim the Collateral securing such Allowed Other
Secured Claim or (c) have such Allowed Other Secured Claim
reinstated as against the applicable Reorganized Debtor and made
unimpaired in accordance with section 1124(2) of the Bankruptcy
Code, notwithstanding any contractual provision or applicable
non-bankruptcy law that entitles the holder of an Allowed Other
Secured Claim to demand and receive payment of such Claim prior

to the stated maturity of such Claim from and after the occurrence of a default. Such treatment shall be determined by the Proponents.

    4.4  <u>Unsecured Claims (Class 4)</u>.

        (a)  <u>Distributions</u>.

            (i)  <u>No Qualifying Transaction</u>.

        In the event that no Qualifying Transaction occurs and except as set forth in Sections 4.4(b) and 4.4(c) hereof, in full and complete satisfaction and discharge of its Allowed Unsecured Claim, each holder of an Allowed Unsecured Claim in each of Subclass 4A (Entertainment), Subclass 4B (The Asher Candy Company), Subclass 4C (Fleer Corp.), Subclass 4D (Frank H. Fleer Corp.), Subclass 4E (Heroes World Distribution, Inc.), Subclass 4F (Malibu Comics Entertainment, Inc.), Subclass 4G (Marvel Characters, Inc.), Subclass 4H (Marvel Direct Marketing Inc.) and Subclass 4I (Skybox International Inc.)of Class 4 (Unsecured Claims) shall, to the extent not paid prior to the Consummation Date, be distributed, subject to increase or decrease pursuant to Section 9.5 hereof:

    (1) its Ratable Proportion of the Unsecured Creditor Payment;

    (2) its Ratable Proportion of one million (1,000,000) Plan Warrants plus three (3) Plan Warrants for each eighty dollars ($80) of Allowed Unsecured Claims in excess of twenty million dollars ($20,000,000) but in no event more than one million seven hundred and fifty thousand (1,750,000) Plan Warrants in the aggregate;

    (3) its Ratable Proportion of the thirty percent (30%) interest in the Net Avoidance Litigation Proceeds to be distributed pursuant to Section 7.4(b) hereof;

    (4) its Ratable Proportion of the first four million five hundred thousand dollars ($4,500,000) of Net MAFCO Litigation Proceeds plus a thirty percent (30%) interest in any Net MAFCO Litigation Proceeds in excess of four million five hundred thousand dollars ($4,500,000) to be distributed pursuant to Section 7.4(b) hereof; and

    (5) its Ratable Proportion of eight hundred thirty two thousand five hundred (832,500) Stockholder Series A Warrants, nine hundred thirty six thousand five hundred sixty three (936,563) Stockholder Series B Warrants, and one million six hundred eighteen thousand seven hundred fifty (1,618,750) Stockholder Series C Warrants.

30

The number of Warrants to be distributed hereunder is subject to increase or decrease pursuant to Section 9.5 hereof.

(ii) <u>Qualifying Transaction</u>.

In the event that a Qualifying Transaction occurs and except as set forth in Sections 4.4(b) and 4.4(c) hereof, in full and complete satisfaction and discharge of its Allowed Unsecured Claim, each holder of an Allowed Unsecured Claim in each of Subclass 4A (Entertainment), Subclass 4B (The Asher Candy Company), Subclass 4C (Fleer Corp.), Subclass 4D (Frank H. Fleer Corp.), Subclass 4E (Heroes World Distribution, Inc.), Subclass 4F (Malibu Comics Entertainment, Inc.), Subclass 4G (Marvel Characters, Inc.), Subclass 4H (Marvel Direct Marketing Inc.) and Subclass 4I (Skybox International Inc.) of Class 4 (Unsecured Claims) shall, to the extent not paid prior to the Consummation Date, be distributed the same property as set forth in Section 4.4(a)(i) above except that each holder of an Allowed Unsecured Claim shall receive in lieu of the Plan Warrants to be distributed pursuant to Section 4.4(a)(i)(2) above one dollar and thirty cents ($1.30) for each Plan Warrant which would have otherwise been distributed to such holder.  In addition, holders of Allowed Unsecured Claims shall receive all Excess Proceeds until all holders of Allowed Unsecured Claims have received payment in full.

(b)  <u>Intercompany Claims</u>.  Each holder of an Allowed Intercompany Claim shall receive, in full and complete satisfaction and discharge of its Intercompany Claim, its Ratable Proportion of one dollar ($1).  In lieu thereof, at the election of the Proponents, any Intercompany Claims shall be treated as contributions to the capital of the obligor on such Intercompany Claims.

(c)  <u>LaSalle Claim</u>.  LaSalle shall receive the LaSalle Settlement Amount in full and complete satisfaction and discharge of the LaSalle Claim; <u>provided</u>, <u>however</u>, that nothing contained herein shall be construed as a discharge of obligations (other than those of the Debtors and their subsidiaries) under the Indentures.

4.5  <u>Class Securities Litigation Claims (Class 5)</u>.

(a)  <u>Distributions</u>.  Subject to allocation between holders of Allowed Class Securities Litigation Claims and holders of Allowed Equity Interests in Subclass 6A (Entertainment) of Class 6 (Equity Interests) in accordance with Section 4.5(b) hereof, each holder of an Allowed Class Securities Litigation Claim shall be distributed, in full and complete satisfaction and discharge of its Allowed Class Securities Litigation on account of such Allowed Class Securities Litigation Claim its Ratable Proportion of (i) two million eight hundred sixty seven thousand

31

five hundred (2,867,500) Stockholder Series A Warrants, (ii) one
million eight hundred thirty eight thousand four hundred thirty
eight (1,838,438) Stockholder Series B Warrants, (iii) four
million eight hundred fifty six thousand two hundred fifty
(4,856,250) Stockholder Series C Warrants, and (iv) Net MAFCO
Litigation Proceeds in the amounts set forth in Section 7.4
below, and, in the event a Qualifying Transaction closes pursuant
to which holders of Fixed Senior Secured Claims and holders of
Unsecured Claims are paid in full, all Excess Proceeds not
distributed to holders of Unsecured Claims.  The number of
Warrants distributed hereunder is subject to increase or decrease
pursuant to Section 9.5 hereof.

          (b)  <u>Calculation of Distribution</u>.  For purposes of
effecting distributions hereunder on account of Allowed Class
Securities Litigation Claims and Allowed Equity Interests in
Subclass 6A (Entertainment) of Class 6 (Equity Interests), any
judgment evidencing any Allowed Class Securities Litigation Claim
shall be converted into an implied number of shares of common
stock of Entertainment calculated as the quotient of (i) the
aggregate amount of any such judgment, divided by (ii) the
average of intraday high and low average sales prices of a share
of common stock of Entertainment on the New York Stock Exchange,
as reported in <u>The Wall Street Journal</u> (National Edition) for the
ten consecutive trading days ending on the trading day
immediately preceding the date of the commencement of any action
underlying any Allowed Class Securities Litigation Claim.

          (c)  <u>Parity of and Limitation on Distributions</u>.
The distributions to be made under this Section 4.5 on account of
Allowed Class Securities Litigation Claims shall be made on the
basis of parity with the Equity Interests in Subclass 6A
(Entertainment) of Class 6 (Equity Interests) and subject to the
limitation that holders of Allowed Class Securities Litigation
Claims and Equity Interests in Subclass 6A (Entertainment) of
Class 6 (Equity Interests) shall only be entitled to a single
recovery on account of such Claims and Equity Interests.

    4.6  <u>Equity Interests (Class 6)</u>.

         (a)  <u>Entertainment (Subclass 6A)</u>.

            (i)  <u>Distributions</u>.  Subject to allocation
between holders of Allowed Class Securities Litigation Claims and
holders of Allowed Equity Interests in Subclass 6A
(Entertainment) of Class 6 (Equity Interests) in accordance with
Section 4.5(b) and 4.5(c) hereof, each holder of record of an
Allowed Equity Interest in Subclass 6A (Entertainment) of Class 6
(Equity Interests) as of the Consummation Date shall be
distributed, in full and complete satisfaction and discharge of
such Allowed Equity Interest, on account of such Allowed Equity